# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **TERRY JOE JOHNSTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:14-0017** |
| v. | ) | **Judge Nixon / Knowles** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 9. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 10. Plaintiff has filed a Reply. Docket No. 13.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I.  INTRODUCTION

Plaintiff filed his application for Disability Insurance Benefits ("DIB") on June 7, 2010,

1

alleging that he had been disabled since February 27, 2010, due to left and right knee replacements, a left ankle sprain, and a "left foot deformity." *See, e.g.,* Docket No. 7, Attachment ("TR"), pp. 114, 145. Plaintiff's application was denied both initially (TR 58) and upon reconsideration (TR 59). Plaintiff subsequently requested (TR 73) and received (TR 86) a hearing. Plaintiff's hearing was conducted on July 12, 2012, by Administrative Law Judge ("ALJ") Ronald Miller. TR 31. Plaintiff, vocational expert ("VE"), Chelsea Brown, and witness, Joe Johnston (Plaintiff's father), appeared and testified. *Id.*

On September 7, 2012, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 13-25. Specifically, the ALJ made the following findings of fact:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since February 27, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: bilateral knee osteoarthritis; and status post bilateral total knee replacement surgery (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of medium work as defined in 20 CFR 404.1567(c). The claimant can lift and carry 50 pounds occasionally and 25 pounds frequently; can stand and walk for 6 hours in an 8-

hour workday; can sit for 6 hours in an 8-hour workday; can frequently push and pull with his bilateral lower extremities; can frequently climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; and can frequently balance, stoop, kneel, crouch, and crawl.

6.     The claimant is capable of performing past relevant work as a bagger. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from February 27, 2010, through the date of this decision (20 CFR 404.1520(f)).

TR 18-24.

On October 10, 2012, Plaintiff timely filed a request for review of the hearing decision. TR 8. On November 6, 2013, the Appeals Council issued a letter declining to review the case (TR 1-3), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.  REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III.  CONCLUSIONS OF LAW

### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the

administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The

purpose of this review is to determine (1) whether substantial evidence exists in the record to

support the Commissioner's decision, and (2) whether any legal errors were committed in the

process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept

as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999)

(*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been

further quantified as "more than a mere scintilla of evidence, but less than a preponderance."

*Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v.

N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner

if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different

conclusion, the decision of the Administrative Law Judge must stand if substantial evidence

supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270,

273 (6th Cir. 1997).  However, if the Commissioner did not consider the record as a whole, the

Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985)

(*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484

F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence:

(1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of

medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age,

education, and work experience.  *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving

his or her "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not

only includes previous work performed by Plaintiff, but also, considering Plaintiff's age,

education, and work experience, any other relevant work that exists in the national economy in

significant numbers regardless of whether such work exists in the immediate area in which

Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he

or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[1] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her

---

[1] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in failing to properly consider: (1) the opinion of "treating and/or consulting" surgeon, Dr. Michael Kelton, and failing to resolve inconsistencies between this opinion and the ALJ's decision; (2) Plaintiff's mental impairments and the resulting "work-related limitations"; and (3) the observations of Plaintiff's father regarding the severity of Plaintiff's impairments. Docket No. 9-1 at 1-2. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Weight Accorded to the Opinion of Dr. Michael Kelton

Plaintiff maintains that the ALJ failed to consider the opinion of "treating and/or

consulting" surgeon Dr. Michael Kelton, and resolve "significant inconsistencies" between that opinion and his decision. Docket No. 9-1 at 7. Plaintiff argues that Dr. Kelton's January 4, 2011, "release to return to work" notation that Plaintiff "may only work 5 hrs/day" shows that Plaintiff cannot perform sustained work activity at any level on a regular and continuing basis. *Id.* at 9, *citing* TR 492. Plaintiff also contends that, contrary to the ALJ's finding that Dr. Kelton's opinion was inconsistent with the medical records, Dr. Kelton's opined limitations were consistent with Plaintiff's subjective allegations, with the opinions of his medical providers, and with treatment records indicating that: (1) Plaintiff continued to use a cane for balance problems; (2) Plaintiff's right knee continued to give out on him; (3) Dr. Kelton released Plaintiff to work only part-time; and (4) Dr. Kelton "did not know" if Plaintiff had the strength or stamina to perform a full day's work. *Id.* at 9-10*, citing* TR 414, 476.

Plaintiff additionally argues that, although the ALJ noted that Dr. Kelton's opinion was inconsistent with that of Dr. Briggs, Dr. Briggs' opinion was "mere speculation" regarding the potential improvement Plaintiff would experience after knee replacement, since it was completed in August 2010, before Plaintiff's December 2010 surgery. *Id.* at 10. Plaintiff notes that, while his post-op updated "x-rays showed expected alignment of his surgically implanted hardware," "it is certainly reasonable that [he] would have persistenly [*sic*] limitations due to these impairments . . . despite the good alignment of the [surgical] hardware." *Id.*

Defendant responds that the ALJ properly evaluated Dr. Kelton's opinion. Docket No. 10 at 10. Specifically, Defendant argues that the ALJ appropriately found Dr. Kelton's opinion that Plaintiff could perform only part-time work to be inconsistent with the medical record and identified examples of the medical records that contradicted that opinion. *Id.* at 10-11, *citin*g TR

8

24. Defendant notes that Dr. Kelton did not provide a basis for the opined limitation, nor did he "disclose the impairment that caused the limitation."[2] *Id.* Defendant additionally calls into question Dr. Kelton's treating relationship with Plaintiff, stating: "Because Dr. Kelton did not examine Plaintiff after removing the staples, the doctor did not have a lengthy treating relationship." *Id.* at 12. Defendant also asserts that "there is no evidence" that Dr. Kelton examined Plaintiff's knees "or intended to provide an opinion regarding his knees." *Id.* at 11. Finally, Defendant points out that Dr. Kelton's opinion was provided four months after Plaintiff's left knee replacement, and the opinion was based on Plaintiff's stamina "at that point." *Id.* at 12, *citing* TR 414. Defendant notes that Dr. Kelton did not state that Plaintiff's limitation was either permanent or would last for twelve continuous months, and notes that Plaintiff never returned to Dr. Kelton for additional treatment. *Id.* at 11-12.

Plaintiff, in his Reply, reiterates his assertion that the ALJ failed to "address or resolve the significant inconsistencies between his RFC finding and the medical opinions of record . . ., particularly of the treating and/or consulting orthopedic surgeon, Dr. Michael Kelton," which "supports a finding of disability." Docket No. 13 at 1-2. Plaintiff also contends that the reasons given by the ALJ for discounting Dr. Kelton's opinion were "extremely insufficient" and "certainly do not amount to 'good reasons' for discounting" the opinion. *Id.* at 2. Plaintiff reiterates his contentions that: (1) his limitations could reasonably persist, even though there is good alignment of his surgical hardware; (2) his subjective allegations are consistent with the opinion of his treatment providers; and (3) Dr. Bigg's August 2010 opinion was "mere

---

[2] Defendant asserts, "Based on the statements regarding when Plaintiff should be excused from work and that surgery was performed in December 2010, the impairment is most likely his bowel obstruction." *Id.* at 11, *citing* TR 423-24.

speculation regarding the anticipated/potential improvement" Plaintiff would be likely to experience. *Id.* at 3. Finally, Plaintiff argues that Defendant's Response proffers additional arguments for rejecting Dr. Kelton's opinion that were not made by the ALJ in his decision, and that are therefore "irrelevant in evaluating whether the ALJ properly provided the required 'good reasons' for rejecting Dr. Kelton's opinion." *Id.*

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. . . .
>
> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. . . .

(4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

. . .

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

The ALJ must articulate the reasons underlying his decision to give a medical opinion a specific amount of weight.[3]  *See, e.g.,* 20 C.F.R. § 404.1527(d); *Allen v. Commissioner*, 561 F.3d 646 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004).  The reasons must be supported by the evidence and must be sufficiently specific so as to make clear to any subsequent reviewers the weight the ALJ gave to the treating source medical opinion and the reasons for that weight.  SSR 96-2p.

The Sixth Circuit has held that, "provided that they are based on sufficient medical data, the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."  *Howard v. Commissioner*, 276 F.3d 235, 240 (6th Cir. 2002)(*quoting Harris v. Heckler*, 756 F.3d 431, 435 (6th Cir. 1985)).  If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The

---

[3] There are circumstances when an ALJ's failure to articulate good reasons for the weight accorded to medical opinions may constitute harmless error: (1) if a treating source opinion is so patently deficient that the ALJ could not possibly credit it; (2) if the ALJ adopts the opinion or makes findings consistent with the opinion; and/or (3) if the ALJ has complied with the goal of 20 C.F.R. §1527(d), by analyzing the physician's contradictory opinions or by analyzing other opinions of record.  *See, e.g., Friend v. Commissioner*, 375 Fed. Appx. 543, 551 (6th Cir. April 28, 2010); *Nelson v. Commissioner*, 195 Fed. Appx. 462, 470-72 (6th Cir. 2006); *Hall v. Commissioner*, 148 Fed. Appx. 456, 464 (6th Cir. 2006).

Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical
> source who provides you or has provided you, with medical
> treatment or evaluation and who has, or has had, an ongoing
> treatment relationship with you.

20 C.F.R. § 404.1502.

Dr. Kelton operated on Plaintiff on December 10, 2010. *See* TR 492. On December 14, 2010, Dr. Kelton wrote Plaintiff a note excusing him from work "due to his recent surgery until January 4, 2010 [*sic*]." TR 491. Dr. Kelton saw Plaintiff on January 4, 2011, and completed a "Work and School Excuse" form in which he opined that, as a result of the surgery performed on December 10, 2010, Plaintiff should be excused from work until January 17, 2011. TR 492. Dr. Kelton also noted that, upon Plaintiff's return to work on January 17, 2011, Plaintiff "may only work 5 hrs/day." *Id.*

The ALJ discussed Dr. Kelton's opinion as follows:

> The opinion of Michael Kelton, M.D., is given little weight
> because it is inconsistent with the claimant's medical records
> (Exhibit 21F). For instance, Dr. Kelton opined that the claimant
> can only work 5 hours per day, which is inconsistent with the
> medical records dated November 10, 2010, showing the claimant
> stated he had improvement with regard to range of motion and
> strength with physical therapy, and he stated he had no right or left
> knee pain (Exhibit 11F, Page 2). This opinion is also inconsistent
> with the x-rays dated May 12, 2011, showing claimant's right knee
> and left knee components were in expected alignment with no joint
> effusion (Exhibit 14F, Pages 1-2). Finally, Dr. Kelton's opinion is
> inconsistent with the opinion of Dr. Briggs, which is given great
> weight (Exhibit 7F).

TR 24, *citing* 304-12, 413-22, 446-50, 491-92.

As noted, Dr. Kelton operated on Plaintiff and conducted post-operative examinations.

Although Dr. Kelton does not have a lengthy treating relationship with Plaintiff, the ALJ must

nevertheless consider all the opinion evidence of record (along with the entirety of the objective

and testimonial evidence) when making his disability determination. *See, e.g.,* 20 CFR §

416.927(d); § 404.1527(d). The ALJ in the instant action has done just that.

With regard to the remaining physical opinion evidence of record, the ALJ discussed

those opinions and the weight accorded thereto as follows:

> The opinion of State agency medical consultant Nathaniel Briggs,
> M.D., is given great weight because it is consistent with the record
> as a whole (Exhibit 7F). For instance, Dr. Briggs opined that the
> claimant can perform medium exertional work, which is consistent
> with the consultative examination report dated May 26, 2012,
> showing the claimant had 5/5 strength in his bilateral upper and
> lower extremities, and showing he had full range of motion in his
> dorsolumbar spine and bilateral knees (Exhibit 18F, Pages 2, 4, and
> 5). This opinion is also consistent with medical records dated
> November 10, 2010, showing the claimant's x-rays revealed he had
> stable components of the knee replacements, and they were well
> aligned with no signs of loosening (Exhibit 19F, Page 1). Finally,
> this opinion is consistent with the claimant's work history of
> continuing to work approximately 20 to 25 hours per week bagging
> groceries.
>
> The opinion of State agency medical consultant Thomas Thrush,
> M.D., which affirms the opinion of Dr. Briggs, is given great
> weight for the reasons set forth above (Exhibit 16F).
>
> The opinions of consultative examiner Mark Josovitz, M.D., are
> given little weight because they are inconsistent with each other
> (Exhibit 18F). For instance, in his consultative examination report
> dated May 26, 2012, Dr. Josovitz opined that the claimant had
> "zero level of limitation in job activities" (Exhibit 18F, Page 3).
> However, later in his consultative examination report, Dr. Josovitz
> opined that the claimant can only stand and walk for 5 hours per
> day and can only lift and carry 10 pounds continuously (Exhibit
> 18F, Page 3). Additionally, he gave a third opinion in which he
> stated the claimant could lift 100 pounds occasionally and carry 50
> pounds occasionally. The opinions of Dr. Josovitz lack consistency

and reliability. Furthermore, the opinion of Dr. Josovitz is inconsistent with the opinion of Dr. Briggs, which is given great weight (Exhibit 7F).

TR 23-24, *citing* 304-12, 453, 464-79.

The ALJ also discussed the physical medical evidence of record, stating:

> The record establishes the claimant had total knee replacement surgery on his right knee and his left knee due to bilateral knee osteoarthritis. However, as discussed below, the claimant's medical records, physical therapy notes, diagnostic tests, and clinical presentations are inconsistent with severe, disabling knee pain and other symptoms from his bilateral knee osteoarthritis.
>
> First, an operation report shows the claimant underwent total right knee replacement surgery on March 2, 2010 (Exhibit 2F, Pages 11-12). However, physical therapy records dated April 27, 2010, show the claimant reported he had an overall decrease in his pain and symptoms, and he stated that he felt better overall (Exhibit 4F, Page 9). Also, physical therapy records dated April 29, 2010, indicate the claimant's right knee was moving better (Exhibit 4F, Page 11). Physical therapy records dated May 4, 2010, show the claimant had no instability when walking without his cane (Exhibit 4F, Page 13). Furthermore, physical therapy records dated May 11, 2010, and May 13, 2010, indicate the claimant stated his knee felt better overall, and he was able to bend it more (Exhibit 4F, Pages 17 and 19). Additionally, physical therapy records dated May 20, 2010, and May 25, 2010, show the claimant stated he did not have any pain, his knee felt stronger, and his range of motion was doing well (Exhibit 4F, Page 23). Finally, medical records dated May 26, 2010, show the claimant stated he was doing "great," and he had gone back to work (Exhibit 6F, Page 2 and 6).
>
> Second, even though a x-ray dated May 26, 2010, shows the claimant's left knee had only "mild" degenerative changes, the claimant chose to proceed with his left total knee replacement after doing well with his right total knee replacement (Exhibit 5F, Page 1 and Exhibit 6F, Page 19). Thus, an operation report shows the claimant underwent total left knee replacement surgery on June 15, 2010 (Exhibit 5F, Page 6). However, medical records of the claimant's post-operative office visit dated June 29, 2010, show the claimant was doing "excellent," he stated his pain was "minimal," and his range of motion was "excellent" (Exhibit 6F, Page 5).

Also, medical records dated June 30, 2010, show the claimant he had no pain or problems (Exhibit 6F, Page 1). Furthermore, physical therapy records dated July 19, 2010, show the claimant reported his left knee was feeling good (Exhibit 10F, Page 10). Physical therapy records dated July 26, 2010, show the claimant stated his pain was 0/10, and these physical therapy records show the claimant had increased range of motion, increased strength, and improvement in his gait (Exhibit 10F, Page 6). Additionally, medical records dated July 28, 2010, show the claimant was doing very well status post left total knee arthroplasty, and his knee had no signs of instability (Exhibit 11F, Page 6). Medical records dated August 25, 2010, show the claimant stated he had no pain (Exhibit 11F, Page 4). Also, medical records dated September 10, 2010, show the claimant stated he felt like he was getting stronger with functional exercises, and he was planning on returning to work in October (Exhibit 10F, Page 35). Medical records dated October 27, 2010, show the claimant stated his knee had not buckled in the last couple of days, and he felt like his balance was improving (Exhibit 10F, Page 18). Also, physical therapy records dated November 3, 2010, show the claimant stated his balance had improved (Exhibit 10F, Page 1).

Finally, medical records dated November 10, 2010, show the claimant stated he had improvement with regard to range of motion and strength with physical therapy, and he stated he has no right or left knee pain (Exhibit 11F, Page 2). Furthermore, medical records dated November 10, 2010, show the claimant's x-rays revealed he had stable components of the knee replacements, and they were well aligned with no signs of loosening (Exhibit 19F, Page 1). Also, x-rays dated May 12, 2011, show claimant's right knee and left knee components were in expected alignment with no joint effusion (Exhibit 14F, Pages 1-2). A consultative examination report dated May 26, 2012, shows the claimant had full range of motion in his bilateral knees, and he had 5/5 strength in his bilateral lower extremities (Exhibit 18F, Pages 2 and 5).

TR 22-23, *citing* 223-34, 237-303, 333-422, 446-50, 464-79.

The ALJ continued:

Additionally, the claimant's nonuse of prescription pain medication is inconsistent with severe, disabling knee pain. For instance, the claimant testified that he was not taking any prescription pain

medications at the time of the hearing. Furthermore, the claimant's medication list dated June 1, 2012, shows the claimant was not taking any prescription pain medications (Exhibit 13E).

Notably, the claimant's work history is supportive of the above-stated residual functional capacity and inconsistent with severe, disabling knee pain. For instance, the claimant testified that he works approximately 4 to 5 hours per day, 20 to 25 hours per week bagging groceries at Kroger, and the grocery bagging job was classified as a medium exertion job by the vocational expert, as discussed below. Furthermore, the claimant's earnings records show he had $11,335.96 in 2011, which is just below presumptive substantial gainful activity levels (Exhibit 6D).

TR 23, *citing* 132-33, 202.

With respect to the testimony of both Plaintiff and his father, the ALJ recounted:

The claimant testified that he has severe pain in his knees, and he stated he cannot work 8 hours per day, 5 days per week. The claimant also testified that he has difficulty understanding things, and he has trouble with reading and math.

The claimant's father, Joe Johnston, testified that the claimant must lie down for 2 to 3 hours after working because his legs and knees hurt and ache. Mr. Johnson [*sic*] also testified that the claimant has problems with his balance. Mr. Johnston testified that the claimant does not do anything around the house since his knee surgeries. Finally, Mr. Johnston stated that the claimant cannot understand things, and he must manage the claimant's checking account for him and read the claimant's mail to him.

TR 21-22.

As can be seen, the ALJ considered not only Dr. Kelton's opinion, but considered the entirety of the opinion evidence, objective medical evidence (physical), and testimonial evidence of record. As can also be seen, the ALJ discussed contradictions between Dr. Kelton's opinion and the record, and specifically explained the weight he accorded to the opinion evidence and the reasons therefor. When opinions are inconsistent with each other, the final decision regarding

the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. §

416.927(e)(2).

 The ALJ properly discussed the medical and testimonial evidence of record, reached a

reasoned decision that was supported by substantial evidence, and articulated the basis for that

decision.  The Regulations simply do not mandate that the ALJ accord Dr. Kelton's evaluation

greater weight.  Accordingly, Plaintiff's argument regarding the opinion of Dr. Kelton fails.

## 2. Severity of Plaintiff's Mental Impairments

Plaintiff maintains that the ALJ failed to properly consider his mental impairments, and

failed to account for their resulting "work-related limitations."  Docket No. 9-1 at 10.  Plaintiff

argues that, contrary to the ALJ's finding that Plaintiff did not have any severe mental

impairments, Plaintiff has been diagnosed with "borderline intellectual functioning," an

impairment which has a direct effect on his ability to perform mental, work-related activities. *Id.*

Plaintiff contends that the ALJ erred in failing to provide a sufficient rationale for why he did not

find this mental impairment to be severe. *Id.* at 10-11. Plaintiff further argues that, in finding that

Plaintiff's borderline intellectual functioning resulted in no more than mild limitations in mental,

work-related functioning, the ALJ relied on the opinion of the non-examining consultants, who

"eliminated consideration of borderline intellectual functioning based upon academic abilities

ranging up to the eight [*sic*] grade," but who "specifically noted that [Plaintiff] seemed

cooperative but lacked social skills, his thought processes were linear but slow, his affect

appeared blunted, and he seemed credible without signs of exaggeration or symptoms

magnification."  *Id.* at 11, *citing* TR 314, 331.  Plaintiff notes that he was diagnosed with

borderline intellectual functioning based upon "mental status examination and formal IQ testing

(full scale IQ of 73) which was deemed to be valid with good effort." *Id., citing* TR 316-17.

Plaintiff also maintains that the ALJ failed to properly account for his severe borderline intellectual functioning impairment in the residual functional capacity assessment. *Id.* Plaintiff argues that the ALJ should have included mental limitations in his residual functional capacity assessment because: (1) Dr. Viers opined that Plaintiff had mild to moderate limitations in understanding, moderate limitations in concentration and/or pace at times, moderate limitations in his ability to tolerate stress and/or adapt to change at times, and moderate impairment in social interaction, and was unable to manage funds independently due to his borderline intellectual functioning; (2) the discharge diagnosis from Heritage Medical Center noted that Plaintiff had "mental retardation"; (3) Plaintiff has always lived with his parents, has never maintained a checking account, and his parents have durable powers of attorney to manage his affairs for him; (4) Plaintiff's parents have to help him with his "mail and such due to comprehension issues"; (5) Plaintiff does not "handle stress well" and has "difficulty with bosses"; and (6) the consultative examiner noted that Plaintiff was quiet, lacking in social skills, and difficult to understand at times. *Id.* at 11-12, *citing* TR 34-47, 158, 162, 224, 314, 317.

Defendant responds that the ALJ evaluated the record as a whole and properly concluded that, although Plaintiff's borderline intellectual functioning was a medically determinable impairment, it did not impose more than minimal limitations on his ability to perform basic work activities, and was therefore not severe under the Regulations. Docket No. 10 at 7. Defendant contends that, in making this determination, the ALJ properly considered Plaintiff's IQ scores, graduation from high school without special education, and completion of a year-long welding training program, as well as the opinions of the state agency medical consultants who considered

Plaintiff's borderline intellectual functioning and found it not to be a severe impairment. *Id.,* *citing* TR 19, 20, 146, 314, 316, 319-31, 451.

Defendant also argues that Plaintiff has identified no limitations which would preclude performance of his past relevant work as a bagger. *Id.* Defendant notes that Plaintiff has had borderline intellectual functioning "his entire life" and has retained the ability to work as a bagger with earnings above the substantial gainful activity level. *Id.* Defendant further notes that, even after his surgeries, Plaintiff has continued to perform the same job on a part time basis. *Id.*, *citing* TR 39, 48, 125, 466. Defendant contends therefore, that even if the ALJ erred in not finding Plaintiff's mental impairment to be severe, Plaintiff has failed to show that the impairment precludes performance of this job. *Id.*

On this point, Plaintiff's Reply incorporates and relies upon his arguments proffered in his brief. Docket No. 13.

As an initial matter, an impairment can be considered nonsevere only if it is so slight that it could not result in a finding of disability, no matter how adverse a claimant's vocational factors might be. *See, e.g.*, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Salmi v. Secretary of H.H.S.*, 774 F.2d 685, 691-92 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir.1985). When an ALJ finds that a claimant has at least one severe impairment and proceeds to complete the sequential evaluation process, however, the ALJ's failure to find that another condition is a severe impairment cannot constitute reversible error. *See Maziarz v. Secretary*, 837 F.2d 240, 244 (6th Cir. 1987).

In the case at bar, the ALJ found that Plaintiff had severe impairments of bilateral knee osteoarthritis and status post bilateral total knee replacement surgery. TR 18. Because the ALJ

found that Plaintiff had at least one severe impairment and proceeded to complete the sequential

evaluation process, any alleged failure of the ALJ to find other impairments severe cannot

constitute grounds for reversal. *Maziarz*, 837 F.2d at 244. Accordingly, Plaintiff cannot prevail

on this ground.

Moreover, the ALJ explicitly explained his rationale for finding Plaintiff's borderline

intellectual functioning not to be severe. TR 19-20. Specifically, the ALJ stated:

> The claimant's medically determinable mental impairment of
> borderline intellectual functioning does not cause more than
> minimal limitation in the claimant's ability to perform basic mental
> work activities and is therefore nonsevere.
>
> In making this finding, the undersigned has considered the four
> broad functional areas set out in the disability regulations for
> evaluating mental disorders and in section 12.00C of the Listing of
> Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These
> four broad functional areas are known as the "paragraph B"
> criteria.
>
> The record establishes the claimant has borderline intellectual
> functioning, and the claimant achieved a verbal IQ score of 81 and
> a full scale IQ score of 73 on the Wechsler Adult Intelligence
> Scale, Fourth Edition (WAIS-IV) on September 7, 2010 (Exhibit
> 8F, Page 4). However, a psychological report dated May 17, 1978,
> shows the claimant achieved an IQ score of 94 on the Peabody
> Picture Vocabulary Test (PPVT) (Exhibit 1E, Page 1).
> Furthermore, a consultative examination report dated September 7,
> 2010, shows the claimant stated he did not have difficulties
> learning, he was not in special education classes during school, he
> graduated from Mt. Pleasant High School in 1980, and he
> completed a year-long training program in welding (Exhibit 8F,
> Page 2).
>
> As for activities of daily living, the consultative examination report
> dated September 7, 2010, shows the claimant can dress himself,
> bathe, wash his hair, shave, feed himself, use a toilet, shop in
> stores, and handle money independently (Exhibit 8F, Page 3).
> Furthermore, the claimant testified that he works approximately 4

to 5 hours per day, 20 to 25 hours per week bagging groceries at Kroger.

As for social functioning, an Adult Function Report dated June 22, 2010, shows the claimant does not have any problems getting along with family, friends, neighbors, or others (Exhibit 5E, Page 6).

As for concentration, persistence, or pace, the Adult Function Report dated June 22, 2010, shows the claimant finishes things he starts (Exhibit 5E, Page 6). Furthermore, the consultative examination report dated September 7, 2010, shows the claimant was able to recall three of three items after five minutes (Exhibit 8F, Page 2).

As for episodes of decompensation, the record does not indicate that the claimant has had any episodes of decompensation of extended duration.

Based upon his consultative examination of the claimant on September 7, 2010, Jeffrey Viers, M.A., concluded the claimant had moderate limitation in his concentration and pace and moderation limitation in his social interaction (Exhibit 8F, Page 5).

In a Psychiatric Review Technique Form dated September 22, 2010, State agency psychological consultant M. Berkowitz concluded the claimant had mild restriction in activities of daily living, no difficulty maintaining social functioning, mild difficulty maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration (Exhibit 9F, Page 11).

Consequently, the record as a whole, including the claimant's diagnostic tests, clinical presentations, education records, and mental assessments, reasonably establishes the claimant has mild restriction in activities of daily living, no difficulty maintaining social functioning, mild difficulty maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, it is nonsevere (20 CFR 404.1520a(d)(1)).

The opinion of State agency psychological consultant M.

Berkowitz, stating the claimant has no severe mental impairments, is given great weight because it is consistent with the record as a whole (Exhibit 9F). For instance, this opinion is consistent with the record showing the claimant was not in special education classes during school, he graduated from Mt. Pleasant High School in 1980, he completed a year-long training program in welding, and achieved an IQ score of 94 on the PPVT while in high school (Exhibit 1E, Page 1 and Exhibit 8F, Page 2). Furthermore, this opinion is consistent with the consultative examination report dated September 7, 2010, showing the claimant was able to recall three of three items after five minutes (Exhibit 8F, Page 2).

The opinion of State agency psychological consultant P. Jeffrey Wright, Ph.D., which affirms the opinion of M. Berkowitz, is given great weight for the reasons set forth above (Exhibit 15F).

TR 19-20, *citing* 134-40, 156-63, 313-32, 451-52.

As can be seen, the ALJ specifically considered Plaintiff's alleged borderline intellectual functioning, and explained in detail his reasons for finding it not to be a severe impairment. Plaintiff's contention on this point fails..

With regard to Plaintiff's contention that the ALJ erred in failing to properly account for his borderline intellectual functioning in the residual functional capacity assessment, "residual functional capacity" is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c). With regard to the evaluation of physical abilities in determining a claimant's Residual Functional Capacity, the Regulations state:

When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or

crouching), may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(b).

In the case at bar, the ALJ, after evaluating all of the objective medical evidence of record and Plaintiff's reported borderline intellectual functioning, determined that Plaintiff retained the residual functional capacity to perform less than the full range of medium work. TR 20. Specifically, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of medium work as defined in 20 CFR 404.1567(c). The claimant can lift and carry 50 pounds occasionally and 25 pounds frequently; can stand and walk for 6 hours in an 8-hour workday; can sit for 6 hours in an 8-hour workday; can frequently push and pull with his bilateral lower extremities; can frequently climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; and can frequently balance, stoop, kneel, crouch, and crawl.

TR 20.

As has been demonstrated, the record in the case at bar is replete with doctors' evaluations, medical assessments, and test results, all of which were properly considered by the ALJ in determining Plaintiff's "residual functional capacity for work activity on a regular and continuing basis." *Supra* pp. 12-15; TR 21-24, *citing* 132-33, 202, 223-34, 237-312, 333-422, 446-50, 453, 464-79. While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's determination that Plaintiff has not been disabled, as defined in the Social Security Act, since the date his application was filed. TR 21-25. The ALJ properly evaluated the evidence in

determining Plaintiff's Residual Functional Capacity, reached a reasoned decision, and explained the basis therefor; the ALJ's decision was supported by substantial evidence, and the Regulations do not require more. Because there is substantial evidence in the record to support the ALJ's Residual Functional Capacity determination, the ALJ's determination must stand.

### 3. Weight Accorded to Opinion of Plaintiff's Father

Plaintiff maintains that the "ALJ erred in failing to properly consider or evaluate the observations and allegations of Plaintiff's father," Mr. Joe Johnston, regarding the severity of Plaintiff's impairments. Docket No. 9-1 at 13. Plaintiff argues that, despite the "clear mandate" from the Regulations to consider Mr. Johnston's testimony, the ALJ failed to evaluate this evidence apart from a "brief mention/summary of his testimony." *Id.* at 13-14, *citing* SSR 06-03p. Plaintiff asserts that the ALJ failed to assign weight to this testimony, as well as resolve inconsistencies between Mr. Johnston's testimony and the ALJ's decision. *Id.* at 14. Plaintiff contends that Mr. Johnston's testimony is consistent with Plaintiff's allegations, medical evidence in the record, and Plaintiff's claim for disability. *Id.* Plaintiff therefore maintains that the ALJ's failure to properly consider this evidence indicates that the ALJ's decision was not supported by substantial evidence. *Id.* at 14-15.

Defendant responds that the ALJ explicitly discussed the testimony in his decision, and therefore "necessarily considered the evidence." Docket No. 10 at 8. Defendant argues that the ALJ summarized Plaintiff's father's testimony and then discussed the inconsistencies in the record, including Plaintiff's work activity, his medical treatment, and the medical evidence. *Id.*, *citing* TR 21-24.

Plaintiff, in his Reply, argues that despite Defendant's contentions, Plaintiff's work activity, medical treatment, and the medical evidence are consistent with his father's testimony. Docket No. 13, at 4. Specifically, Plaintiff contends:

> For instance, he stated that Plaintiff comes home from work each day and has to lie down for two or three hours, and that he normally stays in bed for two or three hours on his days off due to his pain and fatigue. Tr. 40. As such, this is completely consistent with his work activity, and, in fact, sheds important light on this activity and Plaintiff's difficulties tolerating even this part-time work activity. Nonetheless, the ALJ failed to address this significant aspect of the allegations. Likewise, Plaintiff's father testified that Plaintiff attempted to hold on to his job as long as possible in order to keep his health insurance, but that he did not feel Plaintiff was capable of performing any full-time work. Tr. 40-41. However, the ALJ failed to properly consider or evaluate this aspect of Plaintiff's father's report and allegations at all in his decision despite the regulatory requirement to do so.

*Id.*

As an initial matter, Mr. Johnston is not considered an "acceptable medical source" for purposes of rendering an opinion on disability; rather, he is considered an "other source." *See* 20 C.F.R. § 404.1513(d). The Regulations provide that the ALJ may properly

> use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to -
>
> . . .
>
> (5) Spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers.

20 C.F.R. § 404.1513(d).

When considering opinions rendered by "other sources," the ALJ "generally should

explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  SSR 06-03p.

 At Plaintiff's hearing, Mr. Johnston testified that Plaintiff had been in special education classes in seventh and eighth grade, and that Plaintiff had trouble with reading and could not concentrate. TR 35-36.  Mr. Johnston also testified that he and his wife have powers of attorney for Plaintiff, take care of Plaintiff's checking account, and "have to help him with everything." TR 36-37.  Mr. Johnston opined that he did not believe Plaintiff would be able to live independently. TR 37.  Mr. Johnston reported that Plaintiff "lies down for two or three hours" after work and stays in bed for two or three hours on his days off because his legs and knees ache and he has a bad ankle. TR 40. Mr. Johnston opined that he did not think that Plaintiff would be able to work 40 hours per week at his current job. *Id.* Finally, Mr. Johnston opined that he did not believe Plaintiff to be mentally retarded, but opined that he is "a pint short of a gallon." TR 46.

The ALJ specifically addressed Mr. Johnston's testimony in his decision, stating:

> The claimant's father, Joe Johnston, testified that the claimant must lie down for 2 to 3 hours after working because his legs and knees hurt and ache. Mr. Johnson [*sic*] also testified that the claimant has problems with his balance. Mr. Johnston testified that the claimant does not do anything around the house since his knee surgeries. Finally, Mr. Johnston stated that the claimant cannot understand things, and he must manage the claimant's checking account for him and read the claimant's mail to him.

TR 21-22.

As can be seen, the ALJ clearly considered the testimony of Mr. Johnston. While Plaintiff

asserts that the adjudicator must specifically explain the weight given to the testimony, SSR 06-03p provides that the adjudicator "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p. The ALJ in the case at bar has explained the evidence he considered, the weight accorded thereto, and the reasons therefore. Accordingly, the ALJ complied with SSR 06-03p, and Plaintiff's argument fails.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

_____
E. CLIFTON KNOWLES
United States Magistrate Judge